## McKINNEY *v.* RAGLAND & COMPANY.

### Opinion delivered March 3, 1924.

FRAUDS, STATUTE OF—DELIVERY TO CARRIER—JURY QUESTION.—Whether
a shipment of cotton by the seller under a shipper's order bill
of lading, with directions to notify buyer, was such a delivery as
took a parol contract out of the statute of frauds, was a jury
question where there was evidence that it was agreed that title
should pass when the cotton was so delivered.

Appeal from Jefferson Circuit Court; *T. G. Parham,*
Judge; reversed.

*George Brown* and *Brockman & Lucas,* for appel-
lants.

There was evidence from which the jury could have
found that there was an acceptance of the property,
taking the contract out of the statute of frauds. It was
therefore error to take the case from the jury. 137 Ark.
397. The facts distinguished the case from *Richardson*
v. *Fowler,* 154 Ark. 92.

*Crawford & Hooker,* for appellees.

Delivery to a common carrier, consigned to shipper's
order, is not a delivery to the purchaser, so as to take the
contract out of the statute of frauds. 137 Ark. 401; 250
S. W. (Ark.) 24; 249 S. W. (Ark.) 982; 154 Ark. 92-95;
116 Ark. 198; 111 Ark. 521.

WOOD, J. This is an action by the appellants
against the appellees to recover damages for an alleged
breach of contract. The appellants alleged that appel-

lants and appellees entered into a contract whereby appellants sold to appellees 258 bales of cotton of the value of $20,543; that appellees breached the contract by refusing to pay for the cotton. Whereupon the appellants resold the cotton in order to minimize their damages, and the best available price they could obtain was $19,122; that the difference between the contract price at the time the cotton was sold and delivered to appellees and the price appellants obtained for the cotton amounted to the sum of $1,805, for which the appellants pray judgment.

The appellees, in their answer, denied the allegations of the complaint, and pleaded, in defense to the action, the statute of frauds. N. A. McKinney testified that, about the 20th day of February, 1922, a man by the name of Stone, representing the appellees, came to appellant's place of business at Rison, Arkansas, and took samples of 258 bales of cotton. Witness called up one of the Raglands, of the firm of appellees, and asked him to make a price on the cotton, and, if he could not do so, to send the samples to Camden to a man there who wished to buy. The result of the negotiations was that Ragland offered the witness 17¼ cents per pound for the cotton, which the witness accepted. The cotton was to be delivered f. o. b. cars at Rison, on the platform. Witness proceeded to deliver the cotton on the platform of the railway company at Rison for shipment to the appellees at Pine Bluff, Arkansas. He did not leave out a single bale that Stone had taken samples of. After most of the cotton was on the platform, on the second day after the contract was entered into, Ragland called up witness, and asked witness not to ship the cotton that evening. He did not say he was not going to take it. Witness told Ragland that the cotton was in a dangerous place on the platform, and might get burned from passing trains. Ragland told witness that he would call again in an hour. In about an hour he called witness and said, ''The clouds have blown away, and everything

looks clear. I think everything will turn out all right, and I have insured your cotton for $10,000."

Witness considered that he had sold the cotton to appellees, and he drew on appellees for the price of the cotton, to be paid for at Rison. The cotton was all to be paid for when it arrived at the Pine Bluff compress. Witness did not know that Ragland would not take the cotton until he refused to pay the draft.

Witness was particular about having the cotton insured, because he retained a lien on it for the purchase price, and was anxious to protect his vendor's lien.

The cotton delivered was the identical cotton, bale for bale, that Stone asked samples of. When appellees refused to pay the draft, witness resold the cotton in Pine Bluff, at the suggestion of Ragland to try to sell the same and save any loss. Witness sold the cotton on March 20, 1922, for the best available price. It brought 16 cents per pound.

Ragland & Company told witness that they would not take it and pay for it, because they did not have the money. On cross-examination witness testified that on February 22, 1922, Fitzhugh, of the firm of appellees, called witness over the telephone, and said he would take the cotton. The next day, the 23d, he told witness not to ship the cotton that evening. Witness had a contract with appellees to attach the draft to the bill of lading on arrival of the cotton. Witness shipped the cotton on the 25th of February, and wrote the appellees a letter, saying:

"I am shipping you today the cotton sold to you by telephone Wednesday."

N. E. McKinney, of the firm of appellants, testified that he went with Stone, and helped him gather the samples. The 258 bales of cotton sold to appellees at 17¼ cents would have brought $20,543.15. It was sold for 16 cents, making the net difference $1,805.15. In a conversation witness had over the telephone with appellees, they wanted to know if it would be all right for them to pay the drayage costs and appellants to take

the cotton back, and witness told them "no." They wanted to pay all damages, and have appellants take the cotton back. Witness went to Pine Bluff about the third day after the sale. They had not told witness before that they were not going to take the cotton, but would not answer the telephone. When witness went to Pine Bluff, appellees told witness that the firm appellees had sold the cotton to was about to lay down on them. They showed witness a telegram from that firm, saying: "Cancel the McKinney cotton." Appellee gave no other reason why they would not take the cotton and accept the draft. The bill of lading was made out "R. A. McKinney & Sons, notify Ragland & Company," what is generally called shipper's orders. The draft was attached to the bill of lading. The first witness knew that appellees were not going to take the cotton was when they refused to pay the draft. The cotton had then left Rison.

Ragland Fitzhugh, of the firm of appellees, testified that, about the 22d day of February, 1922, he told Stone to go to Rison and get samples of McKinney's cotton. Stone came back with the samples. Witness got in communication with a Dallas man, who agreed to take the cotton at a certain price. Then witness called up McKinney, and bought the cotton. The price was 17¼ cents, subject to redrawn compress samples and compress weight. Witness wired the man in Texas that he had made the purchase. The next day the Texas man canceled his order. Witness then wired McKinney right away. Witness bought 177 bales, with the privilege of four or five bales over. He did not agree to buy 258 bales, and never had the samples of that number. Within two or three days after that McKinney asked what appellees were going to do about it, and witness told him that the bank would not allow appellees to carry any cotton, so they could not pay for it. Witness showed McKinney the telegram, and he knew definitely when he came into the office that appellees were not going to take the cotton. McKinney shipped 258 bales, when witness

had bought but 177. The first witness knew of the 258 bales was when the invoice came in. That number was not discussed over the telephone. Some samples came from appellants after that, but witness did not open them. Stone was working for Ragland & Company when he took the samples, and was authorized to take them. Witness denied that he had a conversation with Walter Wilkins, Jr., about the 23d or 24th of February, in which he told Wilkins that he had bought 258 bales of cotton from McKinney at Rison. McKinney was at Pine Bluff the next day after witness telephoned him that he could not take the cotton. The bill of lading was dated the 25th of February, 1922, and witness thought that it had not reached him when McKinney came.

F. R. Ragland, of the firm of appellees, testified substantially the same as Fitzhugh. He identified and introduced in evidence a letter which, he stated, was received from the appellants two days after appellees had declined to take the cotton. The letter was dated February 25, and said, in substance, that appellants that day were shipping the cotton that they had sold to the appellees by telephone February 22, 1922, as per contract. The letter also stated that the cotton should reach Pine Bluff Monday or Tuesday, and that appellants were drawing a draft, payable on arrival of the cotton, with shipper's order, bill of lading attached, advising appellees that the draft and bill of lading were being forwarded through the Bank of Rison to the Simmons National Bank of Pine Bluff, for appellees' convenience, and requesting the appellees to take up the draft promptly on arrival of the cotton, as per agreement. This witness further testified that cotton was worth, on the day witness refused to take it, eighteen and forty-two hundredths cents per pound, and was higher on that day than it was on the day witness bought it from appellants.

Walter Wilkins testified, in rebuttal for the appellants, to the effect that he saw Ragland Fitzhugh two or three days before young McKinney was in witness' office, and Fitzhugh said: "Well, I have just bought 258

bales of cotton, and I would like to buy some from you."
Witness then replied: "Rags, whom did you buy it
from?" Fitzhugh replied: "From N. A. McKinney at
Rison."

N. E. McKinney testified, in rebuttal, that he remem-
bered the day he came to appellees' office in Pine Bluff
and asked them what they were going to do about the
cotton. The draft and bill of lading had reached appel-
lees before then.

N. A. McKinney testified, in rebuttal, that the con-
tract with Fitzhugh was that the witness should draw a
draft payable on arrival of the cotton.

Upon the above testimony the court declared the
law as follows: "Under the statute of frauds, in order
to constitute a binding contract for the sale of personal
property of the value of over $30, there must be one of
three things. Either the writing evidencing the con-
tract, or a delivery of part of the goods, or a payment of
part of the purchase price. The court holds in this case
that a delivery of the cotton, or part of it, to the railroad
company, under the bill of lading, consigning the cotton to
N. A. McKinney & Sons, Pine Bluff, or shipper's orders,
is not such delivery as takes this contract out of the
scope of the statute of frauds; and the court instructs
you, as a matter of law, to find for the defendant."

The appellants objected generally to the instruction
and specifically to that part of it which directed the jury
to return a verdict for defendants. The court overruled
appellants' objections, to which ruling appellants duly
excepted. The appellants presented appropriate and cor-
rect prayers for instructions submitting to the jury the
issues which the evidence in their behalf tended to prove,
which prayer the court refused, and appellants duly
excepted to the court's ruling. Judgment was rendered
in favor of the appellees, in accordance with the verdict,
dismissing the appellants' complaint and for costs, from
which judgment is this appeal.

The jury might have found from the testimony that,
on or before February 22, 1922, the appellants sold to

the appellees 258 bales of cotton, to be delivered f. o. b. the cars of a common carrier at Rison, Arkansas; that the contract for the sale and purchase of this cotton was entered into in a conversation between the appellants and appellees over the telephone, after the appellees had examined the cotton by samples taken from each of the 258 bales of cotton; that the appellants delivered the cotton, pursuant to the contract, to the common carrier at Rison, Arkansas, for shipment to Pine Bluff, and had a bill of lading issued therefor and consigned to N. A. McKinney & Sons, notify Ragland & Company. There was testimony to warrant a finding that it was the intention of the parties, when this was done, that the title should pass from the appellants, the sellers, to the appellees, the purchasers. Such being the case, the court erred in declaring, as a matter of law, that there was not such a delivery of the cotton by the seller and acceptance of the same by the purchaser as to take the case out of the statute of frauds, and erred in directing the jury to return a verdict in favor of the appellees. See *Augusta Cooperage Co.* v. *Plant, ante* p. 49 L. R. vol. 17, No. 1, p. 48. As we view the evidence, it is an issue for the jury to determine whether the contract of sale and purchase was taken out of the statute of frauds, and the court should have submitted this issue to the jury, under proper instructions.

This case under the facts is ruled by the doctrine announced in *McGehee* v. *Yunker & Ronk,* 137 Ark. 397, where, among other things, we said: "The rule is that, in the sale of chattels to be shipped by common carrier, the delivery of the commodity by the seller to the purchaser, duly consigned to the purchaser, constitutes a delivery to the purchaser and consummates the sale. The reverse of that rule is that, where the seller consigns the shipment to his own order, thus manifesting his intention to reserve his dominion and right of disposition over the property, nothing else operating to manifest an intention to pass the title, such consignment does not constitute a delivery to the purchaser."

We also announced in that case that "these rules of evidence are not violated by allowing oral proof to show what the real intention of the parties to the transaction was with reference to the question of delivery."

See also *John Meeter & Sons* v. *Paragould Wholesale Grocery Co.*, 158 Ark. 128, and *St. L. S. F. R. Co.* v. *Allison*, 158 Ark. 209.

The appellees contend that the case is ruled under the facts by the doctrine announced in *Richardson* v. *Fowler*, 154 Ark. 92-95. In that case we held (quoting syllabus): "Where grain was consigned to shipper's order, with directions to notify buyer, a delivery to carrier did not pass title to buyer, *there being no evidence that the parties intended such delivery to have that effect."*

But the facts in the present case, as we have seen, clearly distinguish it from the case of *Richardson* v. *Fowler*, because here there is testimony from which the jury might found that it was the intention of the parties that the title should pass when the cotton was delivered by the appellants to the carrier f. o. b. at Rison, Arkansas. It was an issue of fact for the jury, under the evidence, as to whether or not the contract of sale and purchase, as alleged in the appellants' complaint, was taken out of the statute of frauds. The court therefore erred in not submitting this issue to the jury, and for this error the judgment is reversed, and the case is remanded for a new trial.